# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID LYLE SHEHI | ) |

## INFORMATION

The United States charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

### THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

1.   **DAVID LYLE SHEHI** owned a pain management clinic in Rainbow City, Alabama. The clinic was organized as Complex Solutions, LLC, and did business under the name Etowah Pain. **SHEHI** was not a licensed medical professional.

2.   Doctor 1 was the sole physician at Etowah Pain. **SHEHI** recruited Doctor 1 to serve as the physician at Etowah Pain. Doctor 1 had no prior experience or expertise in pain management.

3.   James Ray owned Integrity Medical, LLC, through which Ray marketed health care products and services, including prescription drugs from

specialty pharmacies, durable medical equipment (DME), and electro-diagnostic testing.

4.      John Hornbuckle was President and CEO of QBR, LLC (QBR), a company that provided electro-diagnostic testing. Hornbuckle paid Ray and others to generate patient referrals to QBR for electro-diagnostic testing. Through QBR, Hornbuckle paid Etowah Pain to refer patients to QBR for electro-diagnostic testing.

5.      Dr. Eric Beck owned and operated Valley Center for Nerve Studies and Rehabilitation (Valley Center) and billed insurers for electro-diagnostic testing performed by QBR technicians.

6.      Individual A was, for a time, paid by Ray, through Integrity Medical, to work at Etowah Pain, and to generate prescriptions, DME orders, and electro-diagnostic test orders from Etowah Pain. Individual A was paid a fee per prescription issued, DME ordered, and electro-diagnostic test ordered by Doctor 1 that was reimbursed by insurance.

## BILLING FOR MEDICAL SERVICES

7.      Various public and private entities offer health insurance plans to cover medical care, pharmaceuticals, DME, diagnostic tests, and other services provided to individuals covered by those plans, who are often referred to as "beneficiaries" or "members."

8. The Medicare program is a federal health care benefit program providing benefits to persons over the age of 65 or disabled. Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

9. Blue Cross Blue Shield of Alabama (Blue Cross) is a private health insurance company that provides medical insurance in Alabama and elsewhere.

10. Medicare is a "federal health care program," as defined in 42 U.S.C. § 1320a-7b(f). Medicare and Blue Cross are "health care benefit programs," as defined in 18 U.S.C. § 24(b).

11. Medicare and Blue Cross make insurance payments directly to a provider of medical services or goods, rather than to a beneficiary. This payment occurs after the provider submits the claim to the health care benefit program for payment, either directly or through a billing company. By enrolling in Medicare or Blue Cross, and then submitting a claim for payment, a health care provider is certifying that services or goods being provided to a patient are provided in accordance with the requirements of the insurer.

12. Medicare and Blue Cross will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods.

13. In addition, Medicare and Blue Cross will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute.

14. Medicare and Blue Cross require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

15. Medicare and Blue Cross will pay for certain medically reasonable and necessary services, such as office visits, provided to their beneficiaries.

16. Medicare and Blue Cross rely on standardized code sets to pay health care claims including for office visits. One such code set, the Current Procedural Terminology (CPT), consists of five-digit codes listing certain procedures and services performed or ordered by health care providers. The procedures and services represented by CPT codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b).

17. When claims are submitted to health care benefit programs, health care providers or their designees are expected to identify the proper CPT code or other identifier corresponding to the medical service provided, as well as any appropriate modifiers to designate personnel who performed the visit. Services provided by nurses or other medical staff may be reimbursed by health care benefit programs at a lower rate than services provided by physicians. Office visits that take less physician time or are less medically complex may be reimbursed by health care

benefit programs at a lower rate than more time-intensive or medically complex office visits would be reimbursed.

### QBR AND ELECTRO-DIAGNOSTIC TESTING

18. QBR did business under the name Diagnostic Referral Community. QBR was in the business of conducting electro-diagnostic testing, including nerve conduction velocity tests (NCV tests) and sensory evoked potential tests (SEP tests).

19. An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve damage. An NCV test is performed by running an electrical impulse through the nerve being tested. An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

20. QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by Doctor 1, and QBR provided the testing equipment for those tests. QBR technicians went to Etowah Pain to perform testing on patients there.

21. In exchange for Doctor 1's referrals of patients to QBR, QBR paid **SHEHI**, through Etowah Pain, a fee for each patient referred for testing that was ultimately reimbursed by insurance.

22. QBR sent the NCV and SEP test results to Valley Center, which was operated by Dr. Beck. After tests were interpreted, a separate billing company, owned by Dr. Beck, billed each patient's insurance for the testing. Valley Center

was then paid by the patient's insurance for the testing. Valley Center then paid money it received from insurance to QBR.

23. Medicare paid more than $472,000 for electro-diagnostic testing performed by QBR and ordered by Doctor 1. Blue Cross paid more than $374,000 for electro-diagnostic testing performed by QBR and ordered by Doctor 1.

## COUNT ONE
Conspiracy to Receive Kickbacks and Commit Health Care Fraud
[18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)) and 18 U.S.C. § 1347)]

24. The allegations in Paragraphs 1 through 23 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

25. From at least in or about 2016 and continuing through in or about 2018, within Etowah County in the Northern District of Alabama and elsewhere, defendant

**DAVID LYLE SHEHI**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the United States:

    a. to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be

    made in whole and in part under Federal health care programs, including Medicare; and (B) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, including Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(1); and

  b. to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, Blue Cross, and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, those health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of 18 U.S.C. § 1347.

### Purpose of the Conspiracy

26. It was the purpose of the conspiracy for defendant **SHEHI** and his co-conspirators to unlawfully enrich and benefit themselves by: (1) paying and receiving kickbacks and bribes to ensure that orders for electro-diagnostic testing, including NCV and SEP testing, for Medicare and other Federal health care program

beneficiaries would be referred to and performed by QBR; (2) submitting and causing to be submitted and aiding and abetting in the submission of false and fraudulent claims for medical services, including medical office visits at Etowah Pain and electro-diagnostic testing performed on Etowah Pain patients, that were not medically necessary, not properly provided, or both; (3) concealing and disguising the payment, receipt, and transfer of illegal kickbacks and the proceeds of the fraud; and (4) using proceeds of the scheme for their personal use and benefit and the use and benefit of others.

## Manner and Means

27.     The manner and means by which defendant **SHEHI** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

28.     Hornbuckle offered and paid **SHEHI**, through Etowah Pain, in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing. Hornbuckle caused QBR to pay **SHEHI**, through Etowah Pain, a flat fee for each patient Doctor 1 referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs. These payments were disguised as hourly payments for Doctor 1's time and the time of Doctor 1's staff, but Etowah Pain was actually compensated on a per-patient basis and irrespective of the time Doctor 1 or Doctor

1's staff spent on testing-related tasks.

29. **SHEHI** solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing Doctor 1 to refer Etowah Pain patients for medically unnecessary electro-diagnostic testing by QBR.

30. Hornbuckle paid Ray a flat fee for each patient that Doctor 1 referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.

31. Ray paid Individual A a flat fee for each electro-diagnostic test ordered and each specialty prescription issued by Doctor 1, once those tests and prescriptions were reimbursed by insurers, including by Federal health care programs.

32. **SHEHI** and others caused Etowah Pain to routinely bill health care benefit programs, including Medicare and Blue Cross, for patient office visits using the CPT code that would generate the highest reimbursement. **SHEHI** and others did so even though that code was not warranted for those patient office visits, and others at Etowah Pain warned **SHEHI** that billing in this manner was not allowed by the health care benefit programs.

## Overt Acts

33. In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed,

in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

34. On or about November 21, 2016, QBR paid a $10,850 kickback to **SHEHI**, through Etowah Pain, for electro-diagnostic tests ordered by Doctor 1 and performed by QBR.

35. On or about April 10, 2017, **SHEHI** emailed a QBR employee, "I am becoming a bit concerned over the hours for the technicians at my office. We are now testing patients at 6 month visits which has increased our volume tremendously. However, the techs are occasionally wanting to leave early while there are many tests left to be performed. . . . Just looking for a way to resolve this and maximize the number of patients tested."

36. On or about January 8, 2018, QBR paid a $7,100 kickback to **SHEHI**, through Etowah Pain, for electro-diagnostic tests ordered by Doctor 1 and performed by QBR.

All in violation of 18 U.S.C. § 371.

## FIRST NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

1. The allegations in COUNT 1 of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2. Upon conviction of the offense set forth in COUNT 1 of this Information, the defendant, **DAVID LYLE SHEHI,** shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. The property to be forfeited includes, but is not limited to, a forfeiture money judgment in United States currency, representing the amount of proceeds obtained, controlled, and benefited from as a result of the offense alleged.

4. If any of the property described above, as a result of any act or omission of the defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

PRIM F. ESCALONA
United States Attorney

*/s/Electronic Signature*

_____
JOHN B. WARD
Assistant United States Attorney

*/s/Electronic Signature*

_____
DON B. LONG III
Assistant United States Attorney